First case of the day is Appeal No. 21-1521, USA v. Eric Bard et al. May it please the court, Vanessa Eisenman, on behalf of Antonio McClure. I'll be arguing Mr. McClure's individual argument as well as the joint argument regarding Detective Hart's testimony. Turning first to the sufficiency of the evidence, this case is on all fours with this court's decisions in Jones and Garcia, and as a result, Mr. McClure's conviction should be reversed. Can I ask you a question about that? I hate to jump right in, but when I read the facts in this case, it sort of looks like a drug deal, it smells like a drug deal, and we're not the jury. It's the trouble that I have with this. He's got these text messages which are really incriminating. Then he shows up, and the officers, they watch, they observe, and then they testify to something that looks exactly like a drug deal. Then McClure leaves, and the other defendant is pulled over after he throws drugs out of the car, and the jury says that's enough to convict. I mean, we're not the jury. How do you get over that? Yeah, I think it's a good question, and I think Jones provides us with an answer. Jones is really, really similar to this case, and in Jones, there were a couple of suspicious phone calls. In fact, this was the guy who was, the theory was that he was the cooker, that he was filling in on one day for the cooker who was out. In Jones, there was a couple of suspicious phone calls, even referring to a blender and needing to go to Walmart and getting some stuff. Then Jones is in the known drug dealer's car, in his residence, and he's in the car when drugs are thrown from the car. This court said in a full decision that that is not enough. But this is really different than Jones, because Jones didn't have these detailed text messages. He was captured on the wire, and then in addition to the evidence that Judge Kirsch noted, there's also the jail phone call between your client and Mr. Payne after the fact in coded language that just adds to what the government put on. And remember, we have to view this in the light most favorable to the government. That's absolutely right, Your Honor, but we also have to find inferences beyond a reasonable doubt. And here, there's absolutely no direct evidence that McClure ever possessed drugs. The text messages that you're referring to, there was one phone call before this meeting took place, and in that phone call, there were four words, what's the ticket, and two. Which the agent testified that what's the ticket refers to the drugs. Yes, and we have a problem with that, too, as you know. But again, we have to view it in the light most favorable to the government. Yes, if that evidence was properly admitted. Let's assume it was. Okay. How do you get around that? I think what's the ticket, perhaps, and there was even a special agent that testified later in the trial and said the same thing, that ticket usually by known drug dealers refers to drugs. Fine. Ticket and two. That doesn't mean that he actually possessed drugs, even if he's making an inquiry about it. Where is the evidence that Trice had any drugs in his house on that day? Was he charged with a violation of 18 U.S.C. Section 2? Yes. Okay. Yes. And that is what we have argued is that's a red herring, because for aiding and abetting, you still have to have knowledge of the drugs. This is not a case where, you know, he's the getaway driver or something like that. You still have to know about the drugs. Again, did Trice have drugs in his house? We don't know on that day. Did Trice bring drugs from his house to the car? We have no idea. Did Trice give drugs to the car? Well, we have some idea. It sounds like he went to an apartment building and got the drugs and brought them back. But where is the evidence that he got the drugs at the apartment? Well, the evidence – He was throwing out the – I'm sorry. I was just going to say, if I was on the jury, I would have said, well, he threw them out of the car. Yeah. Again, that's what the government was arguing. But where is the evidence that goes inference by inference? This court has said you have to support every inference in that chain along the way. Where is the evidence that the drugs that were supposedly thrown out – now Payne's counsel is going to argue about that and has brought it up in his brief. But we assume that those – that there were drugs thrown out of the car. Where is the evidence that those were the drugs that came from Trice? There was nothing exchanged in the car. McClure gets out of the car and no one sees anything on him. Nobody sees him give anything to Payne. Why isn't a reasonable inference given there's a wiretap going on. They know Trice is a known drug dealer. They've been surveilling him and up on the wire. Your client has a conversation. What's the ticket to, which there's testimony that that's referring to the drugs and the specific amount that's wanted. Then there's the text between your client and Trice saying, on my way, in code, meet you at the A, which we know is this known drug spot. Tells him he's here. Surveillance and poll cams show that he's there. Trice leaves and returns. McClure gets in the car with Trice and then leaves and goes in with Payne. And then he gets pulled over later after he's thrown – not he, your client, but Payne – after he's thrown drugs out the window. And then they have this recorded call, which the agent testified about. They're using language referring to a drug deal. Again, we have to find beyond a reasonable doubt. And this is exactly the situation in Garcia and Jones. This is a couple of suspicious calls combined with mere presence evidence. There was no evidence that McClure had ever dealt drugs. He was never identified in the investigation. He was never known to be an associate of Trice's. So anyone who comes and has a phone call with Trice on that day is going to be guilty of drug possession. This is a lot more than a phone call. This is a phone call and showing up in his car. That's what it is. I'm going to ask you why you think that Detective Hart couldn't legitimately opine as to what Mr. McClure meant when he asked Trice, what's the ticket, and what Trice meant when he responded to. Hart said he had heard the term ticket used some 40 times in the intercepted phone calls. So why would he not offer a lay opinion that ticket meant drugs and Trice's response of two meant $2,000? Yes. That is not our major problem with Detective Hart's testimony. It's not the ticket and two. Even Special Agent Klein gave expert testimony later in the trial about that. It wasn't our problem, I guess I should say. We argued that it was an improper lay opinion because it was not based on anything that McClure had ever said. But I acknowledge that Trice had used the term ticket. There was much more foundation for the ticket term than for the jail call. The jail call is what we think was entirely improper here. This is two men that Detective Hart had not been investigating, had never investigated. He had never interpreted any of their phone conversations, any of their language, and he says, just because I've listened to a couple of jail calls in the past, I know exactly what these two men who I've never investigated are saying to each other. The government at closing even called this lazy code and saying to the jury, this is something that everybody should have been able to figure out. Well, yes, that's something the jury should have been able to decide. But to have a lay witness who was the case agent, who was really the entire case against McClure, he testified for six hours, and he was the evidence against McClure. To have him go up there and tell the jury, I know exactly what these guys are saying, based on this investigation, which he had not done on those two guys, and to say that I know exactly what they're saying, and they're essentially admitting to the drug deal. That is just a huge stretch. Let's say we agree with you that Hart's lay opinion testimony about the meaning of most of the passages that you cited in your brief from that October 22nd phone call were improper. Why isn't it harmless error here? Kind of for the reasons that I was just talking about, Judge. It's not harmless error because Detective Hart was the entire case against McClure. The drugs that were supposedly thrown from Payne's car, McClure was not in the car at the time, and there was not any evidence tying him to those drugs. But it's a little bit of a stretch to say he was the entire case, because they have the wire intercepts. They have the texts from your client's phone. They have the surveillance. They have the poll camera. That's capturing. And that all came in through Detective Hart. And when Detective Hart testifies for six hours and he tells the jury, I just witnessed on the surveillance video that you just saw, we just witnessed a drug transaction. And when he tells the jury, what you just listened to, and everyone had just as much of an ability to interpret that as he did. When he tells them that's them admitting to the crime, that's all they had. And to have him test... Oh, sorry. Did you say something, Judge Ruffin? No, no. Okay, sorry. I'm just... I am watching the clock, though. Okay, yes. And to have him get up there and say that this was a drug transaction, we all watched it, and to say that this was them admitting, those were inferences that the jury should have been able to make on its own. This was not drug language. He was not an expert. He had not done any investigation against these two before. He should not have been able to tell those things to the jury and essentially tell them that there was an admission. I'm out of time. Thank you. Okay. Thank you. Okay. Thank you. Good morning, Your Honors. Good morning. My name is Luca Jovini, and I represent the appellant in this matter, Carlo Payne. Your Honors, two white jurors with family members convicted of drug charges were admitted to serve as active members on this jury. Alternatively, the first black juror in veneer was preemptively struck by the government, claiming that the strike was related to the juror's family member convicted of a drug charge. In comparing... Was there a white veneer member that was left on the jury whose family member had a drug dealing conviction as opposed to a possession conviction or a generic drug charge? Your Honor, the answer to that question is that we don't know, and that's because the prosecutor did not actually follow up with jurors 13 and 34 with a single question. If the government was so concerned with family members convicted of drug dealing, hearing the term drug charge should have been a buzzword for the prosecutor to follow up. Were those jurors later in the jury rotation? I understood the way Judge Sweeney picked the jury, that those jurors were later in the rotation and the government was running out of preemptory strikes. Could you explain that? Sure, Your Honor. Jurors 13 and 34 were admitted in the first run of jurors. They were part of the first initial 11 active members of the jury. And juror 39, the juror in question that we claim was struck based on race, that juror was in the second round of jurors. And at the time, the government had one strike left. When you raised your Batson challenge, though, you didn't raise the juror 13 issue with the court, did you? Your Honor, the defense counsel did not raise the issue with the court. So how can you raise it here for the first time? Why did you forfeit that argument? Your Honor, we're arguing that we did not forfeit that argument. Specifically, the United States Supreme Court in both Millerell v. Dredke and Snyder v. Louisiana state very clearly that all circumstances concerning racial animosity must be consulted. It's more of a totality of the circumstances analysis. But that's true, but I don't think they say they have to be consulted for the first time on appeal. Your Honor, I'm not aware of any specific language that limits that analysis. Certainly the district court should consider all circumstances. That's clear. But the juror 13 circumstance wasn't raised by the defense as a basis for the Batson challenge. Well, Your Honor, the district court did in fact consider juror 13 and their order on Defendant McClure's motion for a new trial. And the importance of juror 13, Your Honor, is that this specific juror claimed that they had a family member convicted of a drug charge. Again, we don't know if that was drug dealing or drug possession. And when you look at the United States Supreme Court's holding in Snyder v. Louisiana, you'll find that the facts of these cases are strikingly similar. Namely, the court in Snyder compared a black juror and a white juror. The black juror had a conflicting obligation, as did the white juror. Nonetheless, the prosecutor decided to strike the black juror and keep the white juror. And in this case, Your Honor, we need to look at those general shared characteristics as required in the analysis by Snyder. The government claims in their brief that the hair-splicing argument of drug dealing versus drug charges is the clear rationale that the prosecutor at the time asserted for their race-neutral explanation. However, the prosecutor on the record admitted that they would have struck juror 62. Juror 62 was later on in the veneer and did not get an opportunity to serve on the jury. But when the court asked the government whether or not they would have struck that juror, the government conceded that yes, they would have struck that juror. But in fact, juror 62 had the family member convicted of possession and not drug dealing. How do you get around the district court's very specific credibility finding with respect to the prosecutor, which would be the third prong of the Batson challenge? Your Honor, that is part of the third prong of the challenge. However, that's one factor in a multitude of factors that go into a Batson analysis. You have to show it's clearly erroneous. It was a very specific factual determination. And how do you do that? Your Honor, the court was clearly erroneous in their finding that jurors 13 and 34 were not as relevant to the analysis as maybe the subjective intent of the prosecutor. I would urge this court to look at the clean record and the objective facts that are stated therein. And, Your Honors, I see that I'm out of time, so thank you. Thank you very much. Okay. Mr. Baldwin. Good morning. My name is Jeff Baldwin. I represent Eric Bard. Mr. Bard pled guilty in this case to count three and was sentenced to a term of 262 months. During sentencing at the district court level, the government conceded that he was not Mr. Trice or Mr. Stum in the conspiracy. He conceded it's less the conduct and more the criminal history that is driving his guidelines. And that the government further conceded, while I do agree that his conduct did not come anywhere close to Mr. Trice or Mr. Stum, obviously it's his criminal history that's what's driving the guidelines. In this case, Mr. Bard was found to be a career offender based on two convictions when he was under the age of 24. At the time of sentencing, he was 35 years old. The one conviction only counted by four months as being a conviction that could be used for the career offender based on a violation of probation that he received a 90-day sentence for. That's all that brought it into the time period to consider for a career offender. You know, when I read through all of this, it seemed to me that Judge Sweeney did expressly consider whether or not the career offender status overrepresented Mr. Bard's criminal history. He had gotten very significant breaks in the past. What is it in particular that you think Judge Sweeney overlooked in this regard? I believe Judge Sweeney was doing some revisionist history there when he said that Mr. Bard had received such lenient treatment. The first conviction, the one that actually put him into the career offender, the one that was by four months, was a Class B felony dealing which is less than three grams of cocaine when he was, I believe, 21 years of age. It was not a lenient sentence for him to get a six-year sentence with one year. That was Judge Sweeney's interpretation of what the judge did in state court that decade prior. We also, I think it's important to note that Judge Sweeney based his evaluation of Mr. Bard's criminal history on things that I just, quite honestly, I don't believe he was correct in. For instance, he stated you had one other conviction where he sold to a confidential informant, but you were only charged or found guilty of possession rather than dealing. Mr. Bard has no convictions for possession of anything other than marijuana. There wasn't a case where he was charged with dealing and pled down to possession. It simply is not in his record. It's not there. He also indicated that you had handguns even though you were a prohibited person. Yes, he had a 2008 misdemeanor conviction when he was 22 years old for possession of a handgun. That is the only handgun that he has ever been charged with or convicted of, and there was no handguns that were attributed to him in this particular case. So I'm not sure that Judge Sweeney's evaluation of Mr. Bard's record was as accurate as it should have been to base that determination that career offender was appropriate for him. You're not disputing the guideline calculation, though, are you? No, I'm not. You agree that he technically qualifies for it. Technically, and that's the important part. It's the strict, rigid adherence to it when we're talking about a conviction that would have been outside the time limit but for a later violation of probation for smoking marijuana that brought it into the time period that basically drives Mr. Bard's entire sentence, where he's sentenced to 262 months. Mr. Stum, who also received 262 months, was the leader of the conspiracy, and Jashon Trice, who was the other leader of the conspiracy, received a sentence of 210 months. If the Court has no other questions, I'll be happy to sit down. Thank you. Thank you very much. Mr. Wood. Your Honor. Good morning. Counsel. May it please the Court. Bob Wood on behalf of the government. A few responsive points. First, much of Mr. McClure's sufficiency argument is about the danger of a mere presence conviction. Of course, the jury was instructed not to convict on mere presence, and as Your Honor said, the Court should respect the jury's finding. The Ticket 2—I'm going to bounce around because I'm just trying to be responsive and efficient. The Ticket 2 testimony was appropriate for all the reasons the government stated in its brief, but it's also important to note that it's not, strictly speaking, a hard fact that he was testifying to that this means drug deal for sure. He was saying, I was in charge of the wire room that day. I was in charge of sending in the cavalry, and when I heard that, it was my belief that that meant a drug deal was going to happen, so I sent in the cavalry. It was, strictly speaking, fact-based, routine, mine run, 701 testimony. What was the— Go ahead, Judge. Go ahead. Thank you. Let's talk about Detective Hart's testimony. When I look at the chart, I can appreciate why it might be appropriate for him, the detective, to explain what jump out boys meant, but when it comes to phrases like something ain't right or you don't know from a can of paint, I do have difficulty understanding what specifically Hart had learned during the course of the investigation that would give him any particular insight into the meaning of these passages. From the transcript, it appears that the only foundation that was laid for his testimony was his generic knowledge of the investigation, not the prior use of those same terms. For example, by contrast, I do feel that when Hart talked about what pain meant, when he asked Trace, what's the ticket? Hart, the detective, articulated a specific basis in the investigation for knowing what pain meant by those words. Isn't there somewhat of a problem with a number of these passages? So, Your Honor, I think as I tried to convey in the government's brief, there is some distinction in the nature of the foundation between Ticket 2 and the jail call. There's one thing that I'd point out, I'd hasten to point out quickly, and that is that a lot of these passages, there was no objection, and it was not an abusive discretion. You know, set aside whether the plain error review would apply when there's some objections here and some not. It's not an abusive discretion for the judge not to jump in. A can of paint, no objection. For the judge not to jump in and say, I object, I sustain my own objection. Or the same would be true for, I knew what it was, which is the closest thing as interpreted to an admission and perhaps one of the most inculpatory pieces. And also, is he 100 in reference to the reliability and trustworthiness of Trace? All of those were not objected to. So fundamentally, was the foundation as firm under the jail call interpretations as for Ticket 2? Was it as essentially precipient as the Ticket 2 testimony? It was distinct in that regard, and that's the reason the government's harmless error arguments and sufficiency arguments set the jail call aside. When you say it's not as firm, what was the foundation for the jail call? The jail call foundation was in this investigation. Because he had not heard these two individuals, either one of them, before. Right. And, you know, quickly, Rollins, this court has said that particular, there can be precipient opinions about a particular set of individuals, one call, and that foundation was laid here with, very quickly, I'll acknowledge, but with, have you listened to jail calls throughout this investigation and are you familiar with the jargon that the people in this investigation have used? The government sees that as sufficient. It's just not of the same type as Ticket 2. I see a distinction there. I think our position is that there's a distinction there. But it is important to note that although there was an objection to two or three, I could catalog them with their chart, but I don't have that right in front of me, two or three of the suspect's phrasings and interpretations of those phrasings, there was not an objection to some of it. And when you get down to the harmless error analysis of just this piece, it is not burden shifting to say that they offer no really persuasive alternate interpretations of this testimony. And in that sense, it was not an abuse of discretion for the judge to overrule the objections that were made and to not jump in and object to a sponte where no objections were made. And it's not as though, two more things. It's not as though they objected to Agent Hart testifying and interpreting the phone call at all. They let that pass. And it also, under this court, under general rule 701 jurisprudence and the way this court has treated it in certain cases, I've certainly not seen this, but to play the call in its entirety and just have the jury listen and have no interpretations whatsoever, maybe that is the best course, but it doesn't seem particularly helpful to a lay jury to me. And that's why the government views it as helpful under rule 701 sense. I hope that fully answers your question, Your Honor. In a sense, I agree in that there is a difference, but I don't think that difference merits a different result, both on the merits and for harmless error reasons. Mr. Wood, before we move off of Detective Hart's testimony, we laid out in U.S. v. Jett a pretty specific formula for dual agent testimony and suggested a specific jury instruction. And Jett took place, was issued before this trial, and nobody asked for that. Yeah. The instruction was not the same. What happened? And the instruction, so I'll say a couple of things. It wasn't even raised with the court in advance of the detective's testimony. Right. And it should have been. It was not. Well, maybe not. I mean, defendants have trial strategies too that you can't opine on, right? And sometimes it's better for a defendant, for a judge, not to be instructing things like this, particularly if they think the cross-examination is strong. Right. I agree with that. And in that sense, they signed off on an instruction at pages 350, 351. The parties go through and tailor the instruction. And I have no questions for defense strategy in that regard. I'm surprised the government didn't raise it. What I meant was, peeling back the onion a little bit, we've had multiple trainings since Brasher and Jett and Lovies and all these other cases about how to walk through some of these things. And it's, you know, you're in trial. It's difficult. But the reason for that, to give the prosecutors their due, the reason for that may very well have been in part the specific way that the second time the judge gave a contemporaneous instruction, he separated and said on certain matters he's an expert and he can testify as an expert on that. And it may be that in the, you know, Warp and Wolf of trial, they thought it was unnecessary in that regard. That is an attempt at an explanation. It's not a full attempt at an excuse. I understand completely that Jett said this is what should be used. I think with the court's permission, I'll jump quickly to the Batson issue. The two-wave format, as Judge Kershaw pointed out, I think is important here. And in that first wave, using the rubric the defendants would prefer for jurors 51 and 62, the government struck jurors 24 and 26, who were white jurors who said I have a relative who was convicted of a drug charge. With only one strike remaining in the second wave, the government had to be a bit more discerning and faced with something like four potential jurors who gave answers at that level of generality, gave a more specific explanation. And the result was two would-be active white jurors struck by the government for that reason. One would-be alternate black juror struck on a more specific version of that same basis. And although it's not core to step three of Batson analysis, the racial composition of the jury is relevant to the prima facie case, technically moot but still relevant. Were these alternate jurors, by the way? The white jurors who were struck for drug charges, active. The black juror struck, alternate. You know, I don't know how Judge Sweeney picks his jury, but the rules of criminal procedure are very specific as to how juries are supposed to be selected. You first select the trial jury. Then you select the alternates. And it looks like that was not followed here. It looks like, and some judges do this. They lump it all together and they say we're going to pick, first 12 are going to be jurors, and the next two or three are going to be alternates. That is, you cannot do that under the rules of criminal procedure. And I don't know why judges do that and I don't know why lawyers let district judges get away with doing it that way. You can't do it, and there's a good reason for it. Sure. I completely understand that, Your Honor. I will say, to be fair to Judge Sweeney, I have seen judges in our district and other districts do that as a matter of course. Maybe they should not do that. They should not. Maybe this is a lesson for future cases for de novo review of procedural errors, but there was no objection here. It seems to me to be relatively common practice for the judges to say something in effect, so we have our jury and that makes the two of you alternates. Something like that. You can't do that. I've seen district judges, too, where they pull names out of the hat at the end of a trial, and as a defense lawyer, I would always object to that and say, Judge, you can't do that. You will be reversed under the rules of criminal procedure. And they would be. The rules of criminal procedure apply for a very specific way for picking criminal juries, and there are reasons for it. You can't just disregard the rules. At the same time, acknowledging that completely, at the same time, I think this active alternate interplay here is relevant to the Batson analysis. We've also suggested in our case law that in picking a jury that the entire veneer should be questioned before strikes are exercised, which wasn't done here. The two-way format, which I think owed to some degree to COVID protocols, but it may have been. Seems like here, at least the way I viewed it, it seemed like there were a certain number of jurors in the courtroom, and then a second wave of jurors were brought into the courtroom. Safety precaution. And I've seen Judge Sweeney pick juries before in the room, and I had never seen him do two waves before, so that strikes me as something new. I certainly understand the two waves, but the exercising of the strikes could have waited. Right. And the exercising of the strikes in two waves creates a funny wrinkle for the analysis here. Exactly, right. I think that's part of the challenge here. All told, you have jurors 24 and 26, and there's just no, in the government's view at least, there's just no problem with 39. But by breaking it apart, you essentially created a separate record for a siloed Batson claim by doing that. And also just made the juror comparison analysis a little bit more difficult. I'm going to take you somewhere else for a moment, please. Sure. Why was Hart not opining on the defendant's guilt when he said that the October 21st video was video of a narcotics transaction? I did not think that the defense counsel invited that comment when the question was simply whether Hart had witnessed the events of October 21st in person. Well, Your Honor, respectfully, I think that the nature of the question was not at that level of generality. The nature of the question was, you can't say you saw this drug purchase physically in person. And he said, when you put question one and question three together, it was, you didn't see this drug purchase. And then he kind of fought against that a little bit. And then the defense counsel said, but I mean you didn't see it physically in person. Was it referring to the drug purchase? In the government's view, that's perfectly invited. Also, he was testifying as a fact witness. He had already testified. I'm sorry. The government what? The government thought that invited it? The government thinks that that invited it, to call it a drug purchase. Well, or invited it, or at the very least, you have both. Sounds to me like a yes or no question, doesn't it? No? It could. But there was sort of an epistemological debate going on there, too, in the sense that the defense counsel was testing the quality of his perceptions, watching a video. And he was defending his ability to watch the video and make conclusions on that basis. And in that debate, defense counsel uses this term, drug purchase. And he responds with a similar term, sort of in cop speak, narcotics transaction. And so in the government's view, for the government to have said in direct, is what we're watching here on the video a narcotics transaction? That would not. That's not probably a particularly helpful line of questioning. But the way this played out, he was not stepping over any evidentiary lines. And yeah, it also would certainly be a harmless error for all the other reasons stated. And I don't think I have other follow-ups, unless the court has anything. Anyone? No? No. All right. Well, thank you. Thank you, Mr. President. Ms. Eisenman, I'm going to give you your two minutes. Thank you so much, Judge Rovner. I appreciate it. Just a couple of quick responses. Starting where we just left off with Judge Rovner's question, Detective Hart certainly did opine on the defendant's guilt. This is in our appendix, page 22, where you actually physically, you cannot tell these ladies and gentlemen that you actually physically witnessed that in person correct. And he says, that's inaccurate. They witnessed it now. They watched it on the video. This was a drug transaction. That is opining on the defendant's guilt. That cannot be harmless error, especially when it's coming from the case agent, saying what you just saw, even though you couldn't see any packages exchanging hands, even though you didn't see any drugs, you didn't see any, you don't even know whether there was drugs that Trice had at his house, you just saw a drug transaction. That is definitely not harmless error. Judge St. Eve's question about Jett and the instructions missing, we didn't focus on that quite as much because there wasn't a good objection on that. But I would agree with you. And the main thing that I think here that was confusing was that there was kind of the standard expert instruction that was given. We don't really have a problem with how he testified as an expert. But then he goes back into his fact testimony. And there's nothing from the court, nothing from the court to say the basis that you have to judge his testimony on as a fact witness is different than as an expert witness. And a jury, when this is a witness who is testifying extensively and he's the case agent, for the jury to know that now I'm supposed to not be evaluating the expertise, but I'm supposed to be evaluating his personal experience and his personal knowledge with the investigation. I think that is extremely confusing. And the defense didn't ask for it either, right, at that point? No. And neither side did for my review of the transcript. Right. And it was post-Jett. So I was surprised neither side asked. Yes, I agree. I agree. And that's why we kind of put that all in with all the problems with Detective Hart's testimony and didn't just say, you know, this is a clear violation of Jett because we did not have an objection there. And then just one other thing about the objections to the jail call, that's at our appendix 29 through 32. There were multiple objections to this. Basically, defense counsel saying all along, where is the foundation? Where is the foundation for this? And remember, this is not expert testimony, so she doesn't have any prior knowledge that this is what his interpretations are going to be. This is lay testimony. And she says, there's no foundation for this. Where is he getting that? I have no idea where this is coming from. And the court essentially lets it all in because Detective Hart says, well, this is based on this investigation. And that's it. That's all the foundation that there is. But again, he had not been investigating these two men, and there was no evidence that those terms were used by anybody else in the investigation. So I thank you for your extra time, Judge, very much. And thank you all. Thank you. All right. Mr. Chiavine, you asked for a minute. We'll give you your minute. Thank you for the extra time, Your Honor. Your Honors, this was brought up multiple times in both at the trial court and on the government's brief. They mentioned this fact that the racial composition of the jury did not change.    It was brought up in both the trial court and on the government's brief. And it's exactly against the main principles asserted in Batson. Most every single case after Batson, quote, says the Constitution forbids striking even a single prospective juror for a discriminatory purpose. This is recognized in the foundational principle that Batson is not just a right of the defendant, but is also a right of the jury. To argue that the racial composition remained the same, and thus there was no discrimination, overrides that very firmly established principle in Batson. And Your Honor should not consider that in this review. Thank you. Thank you very much. And Mr. Bolt, when you two asked for a minute, and we'll give you the minute. Thank you, Judge. As the government did not address Mr. Bard, I really have no rebuttal. So unless the court has any other questions. Nope. Okay. Is there anything else you want to add before you sit down? No, thank you, Judge. All right.   And I'm going to turn it over to Mr. Wood. One of you. Ms. Eisenman, Mr. Geovine. And Mr. Baldwin, you were all appointed by the court. We thank you for taking. Your pro bono responsibility so seriously. And doing such a fine job for your clients. And Mr. Wood is always. We thank the government as well. For the fine job. That it did today. And case will take be taken under advisement.